Pedro Lopez & others[1] *vs.* Commonwealth & another.[2]

Suffolk. May 7, 2012. - November 9, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Police,* Promotional examination. *Civil Service,* Police. *Anti-Discrimination Law,* Race. *Employment,* Discrimination. *Governmental Immunity. Equal Rights Act. Public Employment,* Police.

Discussion of the standard of review applicable to the allowance of a motion to dismiss. [700-701]

This court concluded that the Commonwealth had consented to suit under G. L. c. 151B, § 4 (1), (4A), and (5), and that the Commonwealth's division of human resources, as an instrumentality of the Commonwealth, did not retain sovereign immunity. [701-702]

In a civil action brought by African-American and Hispanic police officers employed by municipalities throughout the Commonwealth who are subject to the civil service law, alleging that the Commonwealth's division of human resources (division) engaged in racial discrimination through the creation, design, and administration of a multiple-choice examination for candidates seeking promotion to the position of police sergeant, the judge properly dismissed the claim under G. L. c. 151B, § 4 (1), for discrimination in the terms, conditions, or privileges of employment, where the plaintiffs' complaint did not plead facts sufficient to support a claim of liability on a theory of indirect employment by the division [702-706]; similarly, the judge properly dismissed the claim under G. L. c. 151B, § 4 (5), for aiding or abetting discrimination, where the plaintiffs did not allege that any of the employing municipalities had committed a distinct, underlying act of employment discrimination from which a claim of aiding and abetting could be said to derive [713-714].

In a civil action brought by African-American and Hispanic police officers employed by municipalities throughout the Commonwealth who are subject to the civil service law, alleging that the Commonwealth's division of human resources (division) engaged in racial discrimination through the creation, design, and administration of a multiple-choice examination for candidates seeking promotion to the position of police sergeant, the judge erred in dismissing the claim under G. L. c. 151B, § 4 (4A), for interference in the exercise or enjoyment of an employment right, where the plaintiffs alleged facts that, if true, would establish that the division's examination has a disparate impact on African-American and Hispanic police officers. [706-713] Cordy, J., dissenting.

[1]Spencer Tatum, Gwendolyn Brown, and Louis Rosario, Jr.
[2]Personnel administrator of the division of human resources.

In a civil action, the plaintiffs could not proceed on a claim under the Massachusetts Equal Rights Act, G. L. c. 93, § 102, where they had a remedy under G. L. c. 151B, § 4 (4A). [715]

CIVIL ACTION commenced in the Superior Court Department on February 11, 2009.

A motion to dismiss was heard by *Thomas E. Connolly*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Harold L. Lichten* (*Stephen S. Churchill* with him) for the plaintiffs.

*Sookyoung Shin*, Assistant Attorney General, for the defendants.

*Catherine C. Ziehl & Beverly I. Ward*, for Massachusetts Commission Against Discrimination, amicus curiae, submitted a brief.

DUFFLY, J. The named plaintiffs, African-American and Hispanic police officers employed by municipalities throughout the Commonwealth who are subject to the civil service law, G. L. c. 31, brought suit in the Superior Court on behalf of themselves and a class of similarly situated individuals against the defendants, the Commonwealth and the division of human resources (division). The plaintiffs alleged that the division engaged in racial discrimination through the creation, design, and administration of a multiple-choice examination for candidates seeking promotion to the position of police sergeant. According to the complaint, the plaintiffs' employing municipalities (which are not named defendants in this action) relied on a ranked list of candidates who had passed this examination in making promotional decisions. The plaintiffs maintained that, because of the examination's adverse, discriminatory impact on African-American and Hispanic candidates, they were ranked lower on the list than their nonminority counterparts, despite being equally qualified. As a result of not being included at the top of the list from which promotions were made, they were denied promotional opportunities.

A Superior Court judge granted the defendants' motion to dismiss on the ground that the Commonwealth had not waived

its sovereign immunity from suit and, in the alternative, that the plaintiffs had failed to state any claim on which relief could be granted. We granted the plaintiffs' application for direct appellate review. We conclude that the plaintiffs' claim under G. L. c. 151B, § 4 (4A), should not have been dismissed because it alleges adequately that the defendants interfered with the plaintiffs' enjoyment of rights protected by G. L. c. 151B, specifically the plaintiffs' right to be free of racial discrimination in opportunities for promotion, but that the other claims were dismissed properly.

1. *Background.* a. *Prior proceedings.* In 2007, the plaintiffs sued the division and the plaintiffs' municipal employers in the United States District Court for the District of Massachusetts, alleging disparate impact race discrimination in violation of a provision of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(k)(1)(A)(i) (2006) (Title VII).[3] *Lopez* v. *State*, 588 F.3d 69, 72-73 (1st Cir. 2009) (*Lopez*). The State defendants moved to dismiss on the ground of immunity from suit, arguing that Title VII abrogates immunity under the Eleventh Amendment to the United States Constitution only when a State functions as an employer, and that the division is not the plaintiffs' employer. *Id.* at 73. The District Court judge denied the motion, but the United States Court of Appeals for the First Circuit reversed, holding that the division is not the plaintiffs' employer within the meaning of Title VII. *Id.* at 89. On remand, the case proceeded to trial against the municipal employers. In 2009, the instant action was commenced in the Superior Court.

b. *Factual allegations.* The plaintiffs filed the present suit in their individual capacities and as representatives of a class of similarly situated individuals, defined as "[a]ll Black and Hispanic police officers within the Commonwealth of Massachusetts who are employed in cities and towns covered by the

---

[3]The plaintiffs also raised State law claims under G. L. c. 151B, but according to their brief, they later assented to the dismissal of those claims without prejudice in order to pursue them in State court. The Eleventh Amendment to the United States Constitution bars State law claims against State officials in Federal court. See *Lopez* v. *State*, 588 F.3d 69, 73 n.1 (1st Cir. 2009) (*Lopez*), quoting *Pennhurst State Sch. & Hosp.* v. *Halderman*, 465 U.S. 89, 121 (1984).

[S]tate civil service law, [G. L. c.] 31, and who have taken the 2005, 2006, 2007 and 2008 police sergeant promotional examination administered by [the division] but have not been reached for promotion." We recite those facts alleged in the complaint[4] that plausibly suggest entitlement to relief, taking them as true for purposes of our review of the judge's ruling on the motion to dismiss. See *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 635-636 (2008) (*Iannacchino*).

The division, an agency of the Commonwealth, creates, designs, and administers promotional examinations to candidates for promotion to police sergeant.[5] The examinations are comprised of one hundred multiple choice questions taken from "law enforcement and related textbooks." To achieve a passing score, candidates must score at least seventy points; the maximum possible score is one hundred points. The examinations "have, over the last [twenty] years, been shown to have a significant adverse impact upon . . . (Black and Hispanic) test takers while not having been shown to be valid predictors of job performance for a police sergeant." Despite the fact that the division is aware of the test's flaws, assert the plaintiffs, it has "taken no action to design a less discriminatory and more job-related examination procedure."

Municipalities that opt to use the division's examination select candidates for promotion from those at the top of a list prepared by the division, on which passing candidates are ranked by the scores they achieved on the examination. Alternatively, municipalities may choose to conduct their own promotional examinations. However, in "virtually" all municipalities at issue in this action, the division's examination was used without modification in some or all of the four relevant years.

A majority of the plaintiffs passed the examination but did not receive scores high enough to be considered for promotion. According to the complaint, as a result of the use of the division's

---

[4]For convenience, we refer to the plaintiffs' second amended complaint as the complaint.

[5]See G. L. c. 31, § 3 (providing for development of rules to regulate "recruitment, selection, training and employment of persons for civil service positions," including rules providing for "development of examination procedures").

examination, African-American and Hispanic police officers have been ranked significantly lower than their nonminority counterparts, although they are otherwise equally qualified to be police sergeants, and "few, if any, minorities have been promoted to the position of sergeant . . . in civil service municipalities throughout the Commonwealth." As a result, there is a significant disparity between the number of African-American and Hispanic police sergeants in the Commonwealth "and their corresponding numbers in entry-level police officer ranks."[6]

The complaint asserts that the division engaged in discriminatory promotion practices in violation of G. L. c. 151B, § 4 (1), (4A), and (5) (hereinafter § 4 [1], § 4 [4A], and § 4 [5], respectively). The complaint also alleges that the division violated G. L. c. 93, § 102, which provides in relevant part that all persons shall have the same rights to make and enforce contracts as those enjoyed by "white male citizens." The defendants moved to dismiss the complaint for lack of jurisdiction, Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), on the basis of sovereign immunity; or, in the alternative, for failure to state a claim on which relief can be granted, Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). By a margin indorsement, the judge allowed the motion to dismiss for the reasons stated in the division's memorandum.

2. *Discussion.* a. *Standard of review.* "We review the allowance of a motion to dismiss de novo," *Curtis* v. *Herb Chambers I-95, Inc.*, 458 Mass. 674, 676 (2011), accepting as true "the factual allegations in the plaintiffs' complaint, as well as any favorable inferences reasonably drawn from them." *Ginther* v. *Commissioner of Ins.*, 427 Mass. 319, 322 (1998). In determin-

---

[6]Although the plaintiffs also allege that, in the municipalities that employ them, "few, if any, minorities have been promoted to the position of sergeant," they do not specifically allege that there is a significant disparity within such municipalities between the percentage ratio of African-American and Hispanic police sergeants and their numbers in entry-level police officer ranks, on the one hand, and the corresponding percentage ratio of similarly situated nonminority police officers on the other. See *Commonwealth* v. *Arriaga*, 438 Mass. 556, 565-567 & n.5 (2003) ("Consistent with the majority of jurisdictions, we apply the absolute disparity test to determine whether underrepresentation of a group is substantial"). Cf. *Watson* v. *Fort Worth Bank & Trust*, 487 U.S. 977, 1000 (1988) (prima facie case of discriminatory promotion practices may fail where "relevant data base is too small to permit any meaningful statistical analysis").

ing whether the factual allegations are sufficient to survive a motion to dismiss under rule 12 (b) (6), we consider whether the allegations " 'plausibly suggest[] [and are] (not merely consistent with)' an entitlement to relief." *Iannacchino, supra* at 636, quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007) (*Twombly*). Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Iannacchino, supra*, quoting *Twombly, supra* at 555.

b. *Sovereign immunity.* Before addressing the plaintiffs' theories of liability under G. L. c. 151B, we evaluate whether, as asserted by the plaintiffs, the Commonwealth has waived its sovereign immunity under G. L. c. 151B. As a general matter, "the Commonwealth or any of its instrumentalities 'cannot be impleaded in its own courts except with its consent, and, when that consent is granted, it can be impleaded only in the manner and to the extent expressed [by] statute.' " *DeRoche* v. *Massachusetts Comm'n Against Discrimination*, 447 Mass. 1, 12 (2006) (*DeRoche*), quoting *General Elec. Co.* v. *Commonwealth*, 329 Mass. 661, 664 (1953). See *Lopes* v. *Commonwealth*, 442 Mass. 170, 175 (2004) ("Sovereign immunity bars a private action against a State in its own courts absent consent by the Legislature . . ."). Waiver of sovereign immunity will not be lightly inferred; "[c]onsent to suit must be expressed by the terms of a statute, or appear by necessary implication from them." *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. 38, 42 (1981). In asserting that the Commonwealth has not consented to suit and therefore retains sovereign immunity, the division argues that express statutory waiver must authorize suit for each of the plaintiffs' particular claims under § 4 (1), (4A), and (5), in the manner and to the extent expressed in those subsections. We disagree.

General Laws c. 151B, § 9, permits "[a]ny person claiming to be aggrieved by a practice made unlawful under this chapter" to bring a civil action for damages or injunctive relief. Section 4 then delineates various practices — including alleged practices

that form the bases of the plaintiffs' claims — that, when undertaken by "person[s]" or "employer[s]," are "unlawful." Section 1 (1) and (5) of G. L. c. 151B, respectively, define "person" and "employer" to include "the [C]ommonwealth and all political subdivisions," including boards, departments, and commissions. In previous cases considering waiver of sovereign immunity under G. L. c. 151B, we concluded that "[t]he Legislature has expressly waived sovereign immunity of the Commonwealth 'and all political subdivisions . . . thereof' by including them in the statutory definition of persons and employers subject to [G. L. c. 151B]." *DeRoche, supra* at 12. See *Bain* v. *Springfield*, 424 Mass. 758, 763 (1997) ("no doubt" that G. L. c. 151B waives sovereign immunity). Here, the Commonwealth has consented to suit under § 4 (4A) and (5) by including the Commonwealth and its instrumentalities in the statutory definition of "person," and under § 4 (1) by including the Commonwealth and its instrumentalities in the statutory definition of "employer." See G. L. c. 151B, §§ 1, 9. The division's arguments concerning whether it can be subject to liability under these particular subsections ultimately go to whether the plaintiffs have stated a claim on which relief can be granted under rule 12 (b) (6), discussed *infra*, not whether the division, as an instrumentality of the Commonwealth, retains sovereign immunity. Moreover, the division has not identified any provision of G. L. c. 151B explicitly indicating that the Commonwealth and its instrumentalities may be sued only in a particular manner or to a particular extent. Consequently, we conclude that the Commonwealth — and the division, as an instrumentality of the Commonwealth — has consented to suit under G. L. c. 151B.

c. *Theories under G. L. c. 151B.* We now consider whether the plaintiffs have stated claims for which relief can be granted on their three theories of liability under § 4. We conclude that the plaintiffs may not proceed on their claims under § 4 (1) and (5), but that they may proceed with their claim under § 4 (4A).

i. *Section 4 (1).* The plaintiffs allege that the division violated § 4 (1), which makes it unlawful for an employer "because of the race [or] color . . . of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide

occupational qualification." Although they were not directly employed by the division,[7] the plaintiffs argue that the division, as an "employer," may nevertheless be subject to liability on an indirect employment theory, and rely on Federal case law interpreting Title VII to support their claim.

The indirect employment theory was first indorsed in the context of Title VII[8] in *Sibley Memorial Hosp.* v. *Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) (*Sibley*).[9] The plaintiff in *Sibley* alleged that the defendant hospital violated Title VII, which proscribes employers from engaging in certain forms of discrimination based on sex. *Id.* at 1339-1340.[10] Reasoning that Title VII was intended to prohibit employers "from exerting any power [they] may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him," the court concluded that the statute did not contemplate providing protections only in those situations where there was a direct employment relationship between the plaintiff and defendant, i.e., that of "an employee of an employer." *Id.* at 1341. The court held that, although the defendant was not the plaintiff's "actual [or] potential direct employer[]," the complaint alleged sufficient facts to state a claim against one "who control[s] access to . . . employment and who den[ies] . . . access by reference to invidious criteria." *Id.* at 1342.

[7]The plaintiffs concede that they are not direct employees of the division under the traditional common-law test. See *Maniscalco* v. *Director of the Div. of Employment Sec.*, 327 Mass. 211, 212 (1951), quoting *Griswold* v. *Director of the Div. of Employment Sec.*, 315 Mass. 371, 372-373 (1944) (reiterating common-law employer-employee relationship).

[8]Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. (Title VII), addressed in *Sibley Memorial Hosp.* v. *Wilson*, 488 F.2d 1338 (D.C. Cir. 1973) (*Sibley*), is the Federal analogue to G. L. c. 151B. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 163 (1987).

[9]The indirect employment theory developed in *Sibley* is commonly referred to as an "interference theory" and is referred to as such by the plaintiffs. See, e.g., *Lopez, supra* at 89; *Association of Mexican-Am. Educators* v. *State*, 231 F.3d 572, 580 (9th Cir. 2000) (en banc) (*AMAE*).

[10]In *Sibley, supra*, the matter came before the court on the defendant's appeal from the sua sponte entry of summary judgment in favor of the plaintiff. The court agreed that the plaintiff's complaint alleged facts sufficient to support a claim under Title VII, but concluded that "it was not the part of careful adjudication to enter summary judgment sua sponte," and reversed. *Id.* at 1342-1344.

Other circuit courts of the United States Court of Appeals have held similarly that a plaintiff bringing a claim under Title VII need not be in a direct employer-employee relationship with the defendant, so long as the defendant is an employer that "interferes with an individual's employment opportunities with another employer." *Association of Mexican-Am. Educators* v. *State*, 231 F.3d 572, 580 (9th Cir. 2000) (en banc) (*AMAE*), quoting *Gomez* v. *Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019, 1021 (9th Cir. 1983).[11] See *Zaklama* v. *Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988). But see *Lopez, supra* at 89 (declining to adopt indirect employer interference theory for Title VII claims); *Gulino* v. *New York State Educ. Dep't*, 460 F.3d 361, 373-376 (2d Cir. 2006), cert. denied, 554 U.S. 917 (2008) (same).

No Massachusetts appellate decision has addressed squarely the issue whether a plaintiff can sustain a claim under § 4 (1) on an interference theory, see *Thomas O'Connor Constructors, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 72 Mass. App. Ct. 549, 555-556 (2008), and we need not do so here. Even if, as a general matter, we were to conclude that § 4 (1) provides a basis for liability on an indirect employment theory, such a theory is not supported by the facts pleaded in the plaintiffs' complaint. The plaintiffs have not alleged that the division exercised the type of direct control over access to employment opportunities that was present in other cases, see *Sibley, supra*, and *AMAE, supra*, where liability under Title VII has been predicated on an interference theory by an indirect employer. Thus, the plaintiffs have failed to state a claim under § 4 (1) on which relief may be granted.

---

[11]In *AMAE, supra*, Latino, African-American, and Asian-American educators challenged a Statewide certification regime for California public school teachers, alleging that minority candidates disproportionately received failing scores on a test that was a prerequisite for prospective public school teachers and other public school personnel. *Id.* at 578. The defendants appealed from the grant of summary judgment in favor of the plaintiffs on the issue of the applicability of Titles VI and VII of the Civil Rights Act of 1964. *Id.* at 579. The court cited *Sibley, supra*, with approval in holding that California and its credentialing body interfered with the plaintiffs' employment opportunities with local school districts. *AMAE, supra* at 581. The court concluded, in line with *Sibley*, that a "direct employment relationship is not a prerequisite to Title VII liability." *Id.* at 580.

In *Sibley*, *supra*, the plaintiff, a male private-duty nurse, alleged that the defendant hospital, through its supervisory nurses, prevented the plaintiff from reporting to female patients who had requested a private nurse. Although the patients, who would be paying for the private nursing services, could reject the nurse, the hospital controlled the premises on which those services were to be provided as well as the plaintiff's access to patients who would initiate employment, thereby directly denying the plaintiff access to employment opportunities because of his sex. *Id.* at 1339-1342. In *AMAE*, *supra*, California was deemed to be one of the employers of municipal school teachers for purposes of Title VII. In reaching this determination, the court noted the "peculiar degree of control that the State of California exercise[d] over local school districts," which affected "day-to-day operations." *Id.* at 581. "[B]y requiring, formulating, and administering the [mandatory credentialing examination]," California effectively "dictate[d] whom the districts may and may not hire." *Id.* at 582. Based on this pervasive and direct control over hiring,[12] the court concluded that California was liable under Title VII on an indirect employment theory. *Id.*

The relationship between the division and the plaintiffs here is considerably more attenuated. Although the plaintiffs allege that the promotional examination, administered by the division and ultimately used by the municipalities, has "been shown to have a significant adverse [discriminatory] impact upon minority (Black and Hispanic) test takers," they concede that the employing municipalities had the option, under G. L. c. 31, § 11, to create and administer an alternative promotional examination, and to rest promotional decisions on factors other than the examination.[13] Because the plaintiffs' factual allega-

---

[12]"Indeed, the [S]tate is so entangled with the operation of California's local school districts that individual districts are treated as '[S]tate agencies' for purposes of the Eleventh Amendment." *AMAE*, *supra* at 582.

[13]See *Lopez*, *supra* at 77-78 (nothing in Massachusetts civil service law, G. L. c. 31, mandates that municipalities use results of division's promotional examination as sole criterion to evaluate merit-based promotions). See also *Brackett* v. *Civil Serv. Comm'n*, 447 Mass. 233, 255 (2006), quoting G. L. c. 31, § 3 (*e*) (nothing in G. L. c. 31 "mandates that promotions be made in strict rank order based only on examination results. Rather, the statute allows consideration of 'any combination of factors which fairly test the applicant's ability to perform the duties of the position as determined by the administrator [of the division]' ").

tions as to the degree of control the division exercised over the plaintiffs' employment opportunities do not assert the level of control that would be necessary to establish an indirect employment relationship under *Sibley, supra,* and *AMAE, supra,* even if we were to adopt such a doctrine, the § 4 (1) claim was properly dismissed.

ii. *Section 4 (4A).* Unlike § 4 (1), which by its terms prohibits discrimination by employers, the division need not be an employer to be subject to an interference claim under § 4 (4A). Under § 4 (4A), it is unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [G. L. c. 151B], or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by [G. L. c. 151B]." That provision "independently and explicitly provides for an interference claim, not merely against employers, but against all 'person[s].' " *Thomas O'Connor Constructors, Inc.* v. *Massachusetts Comm'n Against Discrimination, supra* at 564 (Rubin, J., concurring in the judgment and dissenting in part).

The complaint alleges that the division violated § 4 (4A) because it interfered with the plaintiffs' enjoyment of their right, pursuant to G. L. c. 151B, to be free from discrimination in the terms, conditions, and privileges of employment. The plaintiffs assert that the interference consisted of the division's repeated administration of a multiple-choice examination despite knowledge of its Statewide, adverse disparate impact on promotional opportunities for African-American and Hispanic candidates, and knowledge that the examination is not a valid predictor of job performance. The plaintiffs do not contend that the division created, designed, or administered the examination with the intent to interfere with their employment opportunities. Rather, they maintain that the division knowingly created, designed, and administered examinations on which African-American and Hispanic police officers performed disproportionately poorly compared to their nonminority counterparts in the pool of potential candidates Statewide, with the result that "few, if any minorities have been promoted" from police officer ranks

to sergeant, and the division thereby unlawfully interfered with the promotional opportunities of minority officers.

The division argues that, even accepting all of the allegations in the plaintiffs' complaint as true, their claim under § 4 (4A) fails as a matter of law: first, because that subsection only prohibits retaliation against persons who exercise their rights under G. L. c. 151B, and the plaintiffs do not allege that the division has retaliated against them; and second, because the word "interfere" in § 4 (4A) must be defined to require conduct undertaken with the "intent to deprive someone of a protected right," which the plaintiffs do not allege.

We turn first to the assertion that § 4 (4A) only prohibits acts of retaliation. To assess this argument, we consider the plain language of the statute, mindful that G. L. c. 151B "shall be construed liberally for the accomplishment of its purposes." G. L. c. 151B, § 9. "[W]e interpret the statutory language 'according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' " *Garrity* v. *Conservation Comm'n of Hingham*, 462 Mass. 779, 785 (2012), quoting *Boston Police Patrolmen's Ass'n* v. *Boston*, 435 Mass. 718, 719-720 (2002).

The language of the statute does not support the division's claim that § 4 (4A) provides protection only against retaliation. Section 4 (4A) has two clauses, only one of which (the second) provides protection against retaliation. The second clause provides that it is an unlawful practice "[f]or any person . . . to coerce, intimidate, threaten or interfere with [another] person for having aided or encouraged any other person in the exercise or enjoyment of any . . . right granted or protected by [c. 151B]." G. L. c. 151B, § 4 (4A). The first clause of § 4 (4A) prohibits "interfere[nce] with . . . the exercise or enjoyment of any right granted or protected by this chapter." Among the rights protected by G. L. c. 151B is the right to be free from discrimination in the terms, conditions, and privileges of employment, which includes the right to equal opportunities for promotion without discrimination on the basis of race, color, or national origin. See

G. L. c. 151B, § 4 (1); *Haddad* v. *Wal-Mart Stores, Inc. (No. 1)*, 455 Mass. 91, 108 (2009).

The cases on which the division relies, *Bain* v. *Springfield*, 424 Mass. 758, 765 (1997), and *King* v. *Boston*, 71 Mass. App. Ct. 460, 472-473 (2008), do not assist it. Those cases cite both G. L. c. 151B, § 4 (4) and (4A), in their discussion of "retaliation" claims because the plaintiffs therein alleged that the defendants interfered with their right to complain of discrimination through conduct that was also retaliatory. In those factual circumstances, the § 4 (4A) claims were described properly as retaliation claims. But, notwithstanding the fact that retaliation may also constitute interference under the second clause of § 4 (4A), retaliation is not required to establish a claim of interference under the first clause of § 4 (4A). See *Pontremoli* v. *Spaulding Rehabilitation Hosp.*, 51 Mass. App. Ct. 622, 624-625, 626 n.4 (2001).[14]

We turn next to the division's argument that the term "interfere" in § 4 (4A) encompasses only acts specifically undertaken with the intent to deprive a person of a protected right. We agree that the word "interfere" in § 4 (4A) is appropriately considered with, and interpreted in light of, the words "coerce," "intimidate," and "threaten" that precede it, and that each implies some form of intentional conduct.[15] However, it is not necessary that a plaintiff allege that such

---

[14]We noted in *Sahli* v. *Bull HN Info. Sys., Inc.*, 437 Mass. 696, 700 (2002), that retaliation claims under G. L. c. 151B, § 4 (4), provide a distinct cause of action from interference claims under G. L. c. 151B, § 4 (4A), but we did not specifically address the distinction. The § 4 (4A) interference claim in that case was premised on alleged retaliation by the defendant that consisted of the filing of a lawsuit against the plaintiff. Balancing the constitutional right to petition government against the competing statutory right to be free from employment discrimination, we concluded that a lawsuit filed by an employer against an employee that has a legitimate basis in law "does not violate the provisions of either § 4 (4) or § 4 (4A), absent evidence that the employer's purpose is other than to stop conduct it reasonably believes violates the terms of [its] contract" with the employee. *Id.* at 705. Our reference to evidence of the employer's purpose in the *Sahli* case was specific to the circumstances as alleged in that case, namely the assertion of retaliation or interference based on the filing of a lawsuit.

[15]By contrast, the Massachusetts Civil Rights Act, G. L. c. 12, § 11H, makes it unlawful for any person to "interfere by threats, intimidation or coercion" with another's exercise of his civil rights. So structured, the word "interfere" is specifically defined by the words that follow it; its meaning,

interference not only was intentional, but was undertaken with a specific intent to discriminate. As was recognized in *School Comm. of Braintree* v. *Massachusetts Comm'n Against Discrimination*, 377 Mass. 424, 429 n.10 (1979) (*Braintree*), quoting *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431 (1971) (*Griggs*), G. L. c. 151B, § 4, like Title VII, "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation."[16]

A violation of a plaintiff's right to be free from discrimination in opportunities for promotion may be established by proof of the disparate impact of an employment practice on promotional opportunities for employees of a particular race, color, or national origin. Discrimination that is based on proof of disparate impact "involve[s] employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another." *Braintree*, *supra* at 429.[17] We recognized in the *Braintree* case that, unlike disparate treatment claims, "discriminatory motive is not a required element of proof" in disparate impact cases. *Id.* See *Griggs*, *supra* at 432 ("good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are

and thus the scope of recovery under the civil rights act, is significantly narrowed by the requirement that the interference must take the form of either threats, intimidation, or coercion. See *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 473, cert. denied, 513 U.S. 868 (1994). The word "interfere" in G. L. c. 151B, § 4 (4A), however, is listed as a separate proscribed act, following threats, intimidation, and coercion.

[16]As the Appeals Court correctly observed, "When the Supreme Judicial Court first recognized that one could base a c. 151B claim on a disparate impact theory, the court did not tether that conclusion to any particular language in the statute." *Porio* v. *Department of Revenue*, 80 Mass. App. Ct. 57, 68 (2011), citing *School Comm. of Braintree* v. *Massachusetts Comm'n Against Discrimination*, 377 Mass. 424, 428 429 (1979). It is nonetheless apparent from its context that the claim that was the focus of our decision was based on G. L. c. 151B, § 4 (1).

[17]Because there is relatively little case law on disparate impact claims in Massachusetts, we look to Title VII for guidance, mindful that Federal interpretations are not binding on this court when construing a State statute. See *Brown* v. *F.L. Roberts & Co.*, 452 Mass. 674, 680 (2008). See also *Massachusetts Bay Transp. Auth.* v. *Massachusetts Comm'n Against Discrimination*, 450 Mass. 327, 337-338 (2008).

unrelated to measuring job capability").[18] This is because "the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson* v. *Fort Worth Bank & Trust*, 487 U.S. 977, 987-988 (1988) (extending application of disparate impact analysis to subjective and discretionary hiring and promotion decisions, which previously had been applied only to hiring and promotion decisions based on standardized tests).

In the context of Title VII claims, the principle that facially neutral employment practices may violate Title VII, even in the absence of demonstrated discriminatory intent, has frequently been applied where standardized employment tests or other standardized criteria have had an adverse impact on hiring and promotion of minority candidates. See *Watson* v. *Fort Worth Bank & Trust*, *supra* at 988, and cases cited. "Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance." *Griggs*, *supra* at 436.[19]

We decide today that, like a claim under § 4 (1), see note 16,

---

[18]Two decades after the United States Supreme Court recognized the availability of a disparate impact theory under Title VII in *Griggs* v. *Duke Power Co.*, 401 U.S. 424 (1971) (*Griggs*), Congress codified the elements required to establish discrimination based on a claim of disparate impact. See *Lewis* v. *Chicago*, 130 S. Ct. 2191, 2197 (2010). Such a claim is established if the plaintiff "demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i) (2006).

[19]Title VII permits "an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(h) (2006). The United States Supreme Court has interpreted this language to mean that ability tests must be demonstrated to be a reasonable measure of job performance. *Griggs, supra* at 433-436. "[D]iscriminatory tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.' " *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 431 (1975),

*supra,* an interference claim under § 4 (4A) may be established by evidence of disparate impact. Because discrimination based on proof of disparate impact does not require proof of discriminatory intent, the element of intentionality is satisfied where it is shown that a defendant knowingly interfered with the plaintiffs' right to be free from discrimination in the terms, conditions, and privileges of employment on the basis of a protected category such as race, color, or national origin. Thus, to make out a prima facie claim under § 4 (4A) based on a disparate impact theory of liability, a plaintiff must allege facts that, if proved, would establish that (1) a defendant utilized specific employment practices or selection criteria knowing that the practices or criteria were not reasonably related to job performance; and (2) a defendant knew that the practices or criteria had a significant disparate impact on a protected class or group.

Here, the facts alleged in the plaintiffs' complaint and reasonable inferences drawn therefrom would, if true, establish that the division knowingly created and administered an examination on which African-American and Hispanic police officers perform more poorly than their nonminority counterparts; was aware that the examination is not reasonably related to job performance; and knew that utilization of the promotional examination caused a significant disparity in the ratio of African-American and Hispanic police officers promoted to the rank of sergeant as compared to the ratio of nonminority police officers so promoted. The plaintiffs assert that African-American and Hispanic candidates who were "equally as qualified" as nonminority test takers regularly take the promotional examination; based on examination results, African-American and Hispanic candidates consistently score lower than nonminorities, and thus are placed too low on the ranked eligibility lists to be hired, despite their being as qualified as nonminorities (who are hired). Based on these allegations, the complaint sets forth a plausible claim that the division's examination has a disparate impact on

quoting 29 C.F.R. § 1607.4(c). See Equal Employment Opportunity Commission regulations, 29 C.F.R. § 1607.5(B) (2012) ("Evidence of the validity of a test or other selection procedure by a criterion-related validity study should consist of empirical data demonstrating that the selection procedure is predictive of or significantly correlated with important elements of job performance").

African-American and Hispanic police officers. See *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009) (plausibility standard requires "context-specific" inquiry that asks court to "draw on its judicial experience and common sense"); *Twombly, supra* at 554-556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement").[20]

It was not necessary that the plaintiffs allege that use of the division's examination led to a disparate impact on promotions in any particular, identified, employing municipality in order to state an interference claim under § 4 (4A). An allegation that a Statewide examination has been shown to disproportionately disadvantage African-American and Hispanic candidates, and is not a predictor of job performance, implies that use of the examination will have a disparate impact on the employment opportunities of at least some African-American and Hispanic police officers within the Commonwealth, by limiting the number of qualified African-American and Hispanic candidates among whom individual municipalities using the examination might seek to make promotions. Cf. *AMAE, supra* at 578, 582 (although there was no allegation that any individual school district had statistically significant racial disparities in hiring, Title VII applied to plaintiff teachers' claim against State of California where minority candidates disproportionately received failing

---

[20]Statistical data, which generally is the source of evidence of disparate impact, will be required at later stages of the proceedings, see *Commonwealth* v. *Arriaga*, 438 Mass. 556, 565-567 & n.5 (2003), but is not required at the pleading stage.

"Standard statistical analysis in discrimination cases generally takes the unprotected group and compares the treatment of that group to the treatment of the protected group to determine whether there is a statistically significant difference. . . . Differences, if any, can be measured in terms of absolute numbers, standard deviations or percentages." Tinkham, The Uses and Misuses of Statistical Proof in Age Discrimination Claims, 27 Hofstra Lab. & Employment L.J. 357, 358 (2010). See, e.g., *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 651-653 (1989) ("if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite," selection mechanism "probably does not operate with a disparate impact on minorities"); *Griggs, supra* at 430 n.7 (use of standardized tests by defendant company "resulted in 58% of whites passing the tests, as compared with only 6% of the blacks").

scores on Statewide examination for public school teachers, and through use of examination, State "created a limited list of candidates from which local public school districts may hire").[21]

iii. *Section 4 (5).* The plaintiffs contend also that the division violated § 4 (5), which makes it unlawful for "any person, whether an employer or an employee or not, to aid [or] abet . . . the doing of any of the acts forbidden under [G. L. c. 151B] or to attempt to do so." The division maintains that this claim was dismissed properly because the plaintiffs failed to allege that the division engaged in intentional discrimination, and because the plaintiffs did not name their municipal employers as defendants. We conclude that dismissal was appropriate, although not for the reasons advanced by the division.

In order to prevail on an aiding and abetting claim under § 4 (5), a plaintiff must show (1) that the defendant committed "a wholly individual and distinct wrong . . . separate and distinct from the claim in main"; (2) "that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender"; and (3) that "the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed him or her under G. L. c. 151B." *Harmon* v. *Malden Hosp.*, 19 Mass. Discrimination L. Rep. 157, 158 (1997).

An aiding and abetting claim under § 4 (5), however, is also "entirely derivative of the discrimination claim." *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 122 (2000). As a consequence, in addition to the "individual and distinct wrong" that the defendant must be alleged to have committed, the complaint must allege the commission of an underlying act of discrimination under G. L. c. 151B (the "main claim") by the principal offender. See *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 n.7 (2002).[22] In this case, the plaintiffs' complaint fails to allege that any of the employing municipali-

---

[21]The division does not suggest that generalized Statewide statistics may not be used to establish a prima facie case of disparate impact. See, e.g., *Dothard* v. *Rawlinson*, 433 U.S. 321, 330 (1977) (noting that "application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory").

[22]We reject the division's argument that under *Russell* v. *Cooley Dickinson*

ties, as the proposed principal offenders, committed a distinct, underlying act of employment discrimination from which the aiding and abetting claim may be said to derive.

In particular, the plaintiffs have not alleged that, because of the use of the division's examination, there is a significant disparity in the ratio of African-American and Hispanic police sergeants and their corresponding numbers in entry-level police officer ranks, compared to the ratio of nonminority police sergeants and the corresponding number of nonminority entry-level officers within the police division of any particular municipality.[23] Because the plaintiffs have not alleged that a specific practice or act was undertaken by one or more particular municipalities that could form the basis of a derivative aiding and abetting claim, they have not met the first of the three elements of a claim under G. L. c. 151B, § 4 (5), and the claim properly was dismissed on this basis.[24]

---

*Hosp., Inc.*, 437 Mass. 443 (2002) (*Russell*), and *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107 (2000) (*Abramian*), the plaintiffs' aiding and abetting claim under § 4 (5) necessarily fails because the municipalities are not named as defendants. In *Russell, supra* at 458 n.7, we held that the conclusion that the principal offender did not engage in employment discrimination under § 4 (16) necessarily resolved a corresponding aiding and abetting claim under § 4 (5) against its director of human resources and employee health. Similarly, in *Abramian, supra* at 122, we concluded that, because an aiding and abetting claim is necessarily derivative of the underlying discrimination claim, where a new trial was ordered for the discrimination claim, a new trial was also required for the aiding and abetting claim brought against separate defendants. Although in those cases both the alleged principal offender and the alleged aider and abettor were parties to the actions, the cases do not stand for the proposition that a claim of aiding and abetting under § 4 (5) necessarily fails where the principal offender is not named as a defendant.

[23]An interference claim under § 4 (4A) does not require such a specific allegation against a particular employer because a defendant (who is not the plaintiff's direct employer) may independently commit an act of discrimination by "interfering" with the plaintiff's employment opportunities with that employer, based on statistical data supporting the disparate impact of the defendant's conduct on all employers within that category of employers. By contrast, an aiding and abetting claim under § 4 (5) requires the defendant to act in concert with one or more specific employers to "aid" or "abet" a primary and independent act of discrimination by those employers.

[24]Allegations that the division "assisted with, and knowingly contributed to, the discriminatory conduct of the various municipalities" and "knowingly allowed municipalities to administer the . . . exam despite its discriminatory

d. *Claim under MERA.* We address briefly the plaintiffs' claim under the Massachusetts Equal Rights Act, G. L. c. 93, § 102 (MERA). Because of our determination that the plaintiffs have a remedy under G. L. c. 151B, § 4 (4A), the plaintiffs cannot also proceed on their MERA claim. Where remedies under G. L. c. 151B "are or were available to a complainant, those remedies are exclusive, preempting the joining of parallel MERA claims." *Martins* v. *University of Mass. Med. Sch.,* 75 Mass. App. Ct. 623, 624 (2009). See *Charland* v. *Muzi Motors, Inc.,* 417 Mass. 580, 586 (1994) ("where applicable, G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections").

3. *Conclusion.* For the reasons stated, we affirm the dismissal of the plaintiffs' claims under G. L. c. 151B, § 4 (1); G. L. c. 151B, § 4 (5); and G. L. c. 93, § 102. We vacate the judgment dismissing the plaintiffs' G. L. c. 151B, § 4 (4A), claim, and we remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

CORDY, J. (dissenting in part). I agree with the court's conclusion that the Commonwealth's human resources division (division) is not the employer of the plaintiff police officers in this case, and the plaintiffs do not have a cause of action against it or its personnel administrator under G. L. c. 151B, § 4 (1), (4), or (5), or G. L. c. 93, § 102. The employers of the police officers are the municipalities that hire and promote them. Those municipalities may elect to use the written examinations prepared by the division to assist in the promotional process, or they may conduct their own alternative promotional examinations, including supplementing the division's examinations with performance assessments. Although the plaintiffs may have a cause of action under these and other statutory provisions against their employ-

impact on hiring" are also insufficient to state an aiding and abetting claim under § 4 (5). These conclusory assertions of discriminatory conduct by "various municipalities" fail to allege a particular practice or act by any identified municipality from which an aiding and abetting claim could derive.

ers (which they are pursuing in Federal court), they do not have one against the Commonwealth.[1]

I disagree with the court's conclusion that an interference claim under G. L. c. 151B, § 4 (4A) (§ 4 [4A]), can be established against a third-party nonemployer without some showing of discriminatory intent. Such a conclusion is contrary to the statute's purpose and intent as determined through the application of accepted principles of statutory construction. Consequently, I respectfully dissent.

In the context of employment, it is unlawful for an employer to discriminate against any individual because of race. G. L. c. 151B, § 4 (1). There are two accepted manners by which such employment discrimination can be demonstrated in litigation: either by way of disparate treatment (which requires a showing of discriminatory intent) or by way of disparate impact (which does not require a showing of discriminatory intent). The availability of each is dependent on the statutory language creating the cause of action. Compare *Currier* v. *National Bd. of Med. Examiners*, 462 Mass. 1, 16 (2012) ("discrimination claims set forth under the cognate Federal provisions to the equal rights act require intentional discrimination and do not permit a plaintiff to proceed under a 'disparate impact' analysis"), with *School Comm. of Braintree* v. *Massachusetts Comm'n Against Discrimination*, 377 Mass. 424, 429 n.10 (1979) (noting § 4 is susceptible to both disparate impact and disparate treatment claims).

In addition to barring employment discrimination by employers, § 4 (4A) also makes it unlawful "[f]or any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment of any right granted or protected" by G. L. c. 151B. The question we must answer in this case is whether a claim under § 4 (4A) can be maintained without an allegation or evidence that the "person" at issue, here the Commonwealth through its division, promulgated the promotional examinations taken by the plaintiffs with the intent and purpose

---

[1]As the court correctly notes, *ante* at 701-702, the Commonwealth is considered a "person" under G. L. c. 151B, § 4 (4A), and has thus waived sovereign immunity for purposes of claims under that subsection. See G. L. c. 151B, §§ 1, 4 (4A).

of discriminating against them on account of their race. The answer to the question is dependent on the statutory language creating the cause of action.

There is no dispute that the words "coerce," "intimidate," and "threaten" that precede the word "interfere" in § 4 (4A) are each imbued with an element of purposefulness or intent. See *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994) (construing language of Massachusetts Civil Rights Act [G. L. c. 12, § 11H]). Specifically, coercion is "the active domination of another's will"; intimidation involves "putting in fear for the purpose of compelling or deterring conduct"; and threatening "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Id.* Their presence in § 4 (4A) suggests that a cause of action brought thereunder requires such a showing. Consequently, the plaintiffs understandably seek to exploit the only ambiguity in the provision: the word "interfere." However, their argument for a broad reading that would shoehorn their claim into a provision which, for all other purposes, requires a showing of discriminatory purpose or intent is unpersuasive in light of our well-established canons of statutory interpretation.

It is fundamental that "statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001). Where, as here, the plain meaning of "interfere" is open to competing interpretations,[2] we have relied on the doctrine of ejusdem generis in discerning legislative intent. See *Commonwealth* v. *Zubiel*, 456 Mass. 27, 31 (2010); *Banushi* v. *Dorfman*, 438 Mass. 242, 244 (2002); *Richardson* v. *Danvers*, 176 Mass. 413, 414 (1900). "This principle . . . 'allow[s] the specific words to identify the

---

[2]The American Heritage Dictionary defines "interfere" as "[t]o be or create a hindrance or obstacle" and "[t]o intervene or intrude in the affairs of others; meddle." "Interfere" is listed as synonymous with "tamper," which means "to tinker with rashly or foolishly" and "to engage in improper or secret dealings, as an effort to influence." American Heritage Dictionary of the English Language 913, 1766 (4th ed. 2006). Although on one hand, the words "tamper," "meddle," and "secret dealings" suggest an element of intent, on the other, the words "[t]o be or create a hindrance or obstacle" do not of necessity suggest the same. See *id.*

class and [restricts] the meaning of general words to things within the class." *Commonwealth* v. *Zubiel, supra,* quoting 2A N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47.17, at 379 (7th ed. 2007). Application of ejusdem generis is particularly "appropriate when a series of several terms is listed that concludes with the disputed language." *Banushi* v. *Dorfman, supra.* In such a statutory enumeration, "the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.,* quoting 2A N.J. Singer, Sutherland Statutory Construction § 47.17, at 273-274 (6th ed. rev. 2000)

In light of this applicable principle of statutory construction, I would conclude that an interference claim under § 4 (4A) requires a showing of the same type of purposeful or discriminatory intent as is plainly required by acts that would constitute coercion, threats, or intimidation.[3]

The guiding principle for analyzing the present case was articulated in *Sahli* v. *Bull HN Info. Sys., Inc.,* 437 Mass. 696, 700 (2002), where an employer brought a declaratory judgment action against a former employee who, after signing a release of liability, had brought an age discrimination claim against the employer. The employee responded by filing a second discrimination claim, alleging that the filing of the declaratory judgment action was retaliation under § 4 (4) and threats, intimidation, coercion, and interference under § 4 (4A). In rejecting both claims, which we clarified constituted "separate and independent causes of action," *id.,* we held that an "employer does not violate the provisions of either § 4 (4) or § 4 (4A), absent evidence that the employer's *purpose* is other than to stop conduct it reasonably believes violates the terms of the contract" (emphasis added). *Sahli* v. *Bull HN Info. Sys, Inc., supra* at 705,

---

[3]Other statutes using this series of words have also been interpreted to carry an element of intent. For example, the Fair Housing Act makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by [§] 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617 (2006). Consequently, to state a cause of action under this section, a plaintiff must allege (and show) that "the defendants' conduct was at least partially motivated by intentional discrimination." *South Middlesex Opportunity Council, Inc.* v. *Framingham,* 752 F. Supp. 2d 85, 95 (D. Mass. 2010).

707. The only logical inference to be drawn from the *Sahli* decision is that a cause of action under § 4 (4A) requires some type of unlawful purpose on the part of a defendant. In this light, the court's newfound recognition of disparate impact liability under § 4 (4A) significantly undercuts our own precedent.

Today's decision is also inconsistent with other interpretations of the statute. For instance, in *Woodason* v. *Norton Sch. Comm.*, 25 Mass. Discrimination L. Rep. 62 (2003),[4] the Massachusetts Commission Against Discrimination (commission) rejected a discrimination claim under § 4 (4A) because the evidence failed to "establish the requisite '*intent to discriminate*'" (emphasis in original). *Id.* at 64. There, and in sharp contrast to the commission's present position as amicus, the commission criticized a commissioner in a previous case involving § 4 (4A) for asserting that "'interfere' stands on its own" and must be construed liberally in light of G. L. c. 151B, § 9. *Id.*, quoting *Bendell* v. *Lemax Inc.*, 22 Mass. Discrimination L. Rep. 259, 262 (2000). To the contrary, the commission held, "In construing the word 'interfere' to give no import to the strong language surrounding it would be misguided," and therefore to be held liable, a person must have, "at the very least, 'interfered' with another's rights in a manner that was in deliberate disregard of those rights." *Woodason* v. *Norton Sch. Comm.*, *supra.*

Similarly, in *Canfield* v. *Con-Way Freight, Inc.*, 578 F. Supp. 2d 235, 242 (D. Mass. 2008), the court, applying Massachusetts law, adopted the *Woodason* interpretation of "interference." In denying a § 4 (4A) claim, the District Court judge noted that, because there was no evidence of "deliberate disregard," which "requires an 'intent to discriminate,'" the defendants could not be held liable for interference discrimination. *Canfield* v. *Con-Way Freight, Inc.*, *supra* at 242, 243.

While language creating a cause of action may often be broad

---

[4]In *Woodason* v. *Norton Sch. Comm.*, 25 Mass. Discrimination L. Rep. 62 (2003), the complainant was a public school cafeteria assistant who had been terminated from her position, which she claimed constituted disability discrimination under G. L. c. 151B, § 4 (16), and interference under § 4 (4A). After a hearing officer of the Massachusetts Commission Against Discrimination found for the complainant on the disability claim and the employer on the interference claim, both parties appealed to the full commission.

enough to pave the way either for a disparate impact or disparate treatment path to discrimination liability, that is not the case here. If the Legislature had sought to create a broader spectrum of liability, especially against persons who are not employers, it could have employed in § 4 (4A) the type of broad language it employed in § 4 (1). It did not, and absent a clear expression of such a purpose, I would not judicially graft a theory of liability onto the statute, particularly when doing so would be abrasive to our precedent and long-standing principles of statutory interpretation on which the Legislature should properly be able to rely. See *Commonwealth* v. *Zubiel, supra* at 31; *Sahli* v. *Bull HN Info. Sys., Inc., supra* at 707.

Therefore, I respectfully dissent.