NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1316                                        Appeals Court

STEPHEN TRYCHON  vs.  MASSACHUSETTS BAY TRANSPORATION AUTHORITY.

No. 15-P-1316.

Suffolk.     May 16, 2016. - September 15, 2016.

Present:  Agnes, Massing, & Kinder, JJ.


Massachusetts Bay Transportation Authority.  Practice, Civil,
     Motion to dismiss.  Employment, Termination, Retaliation.


     Civil action commenced in the Superior Court Department on
February 11, 2014.

     A motion to dismiss was heard by Heidi E. Brieger, J.


     Kevin G. Powers for the plaintiff.
     Jeffrey A. Dretler for the defendant.


     AGNES, J.  In this appeal, we must determine the legal

sufficiency of Stephen Trychon's complaint charging the

Massachusetts Bay Transportation Authority (MBTA) with

violations of G. L. c. 149, § 185, the Massachusetts public

employee whistleblower statute (whistleblower statute).  A

Superior Court judge allowed the MBTA's motion, pursuant to

Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), to dismiss the

complaint.[1]  We conclude that Trychon has stated a plausible claim for relief.  See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).  Accordingly, we reverse the judgment.

1.  Standard of review.  We review the order dismissing the complaint de novo, accepting the truth of all factual allegations and drawing all reasonable inferences in Trychon's favor.  See Glovsky v. Roche Bros. Supermarkets, Inc., 469 Mass. 752, 754 (2014).  A complaint is sufficient to withstand a motion to dismiss if the factual allegations "plausibly suggest" an entitlement to relief, raising the right to relief "above the speculative level."  Harrington v. Costello, 467 Mass. 720, 724 (2014), quoting from Iannacchino, supra.  See Mass.R.Civ.P. 8(a)(1), 365 Mass. 749 (1974).  The factual content is sufficient if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 23 (1st Cir. 2014), quoting from Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and "it . . . raise[s] a reasonable expectation that discovery will reveal evidence [of the alleged misconduct]."  Lopez v. Commonwealth, 463 Mass. 696, 712 (2012), quoting from Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

---

[1] In that motion, the MBTA also requested attorney's fees, which the judge did not allow.

In conducting the "context-specific" inquiry required by the plausibility standard, we must "draw on [our] judicial experience and common sense." Lopez, supra, quoting from Ashcroft, supra at 679. "The critical question is whether the claim, viewed holistically, is made plausible by 'the cumulative effect of the factual allegations' contained in the complaint." A.G. v. Elsevier, Inc., 732 F.3d 77, 82 (1st Cir. 2013), quoting from Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011).

2. Background. We recite the allegations of Trychon's complaint, along with reasonable inferences that may be drawn from those allegations. Although merely allegations, we must accept them as true for the purposes of reviewing the dismissal of a complaint. See Harrington, supra.

Trychon's employment. The holder of a master's degree in business administration, Trychon worked in various management positions for the MBTA from his date of hire on March 30, 2009, until April 10, 2013.[2] During that time period, he was promoted

---

[2] Hired as a program manager, Trychon was promoted first to the position of deputy director of the division of system-wide maintenance and improvement (SMI) and from there to the position of director of SMI. As the director of SMI, he oversaw three departments: communications, signals, and maintenance of ways (MOW). His subordinates included MOW director Patrick Kineavy and deputy director Matthew McGuire. As the MBTA acknowledges, SMI is also commonly known as engineering and maintenance (E & M). For purposes of this decision, we refer, as the complaint does, to SMI and E & M interchangeably.

twice and received excellent performance reviews.  His job duties and responsibilities grew over time.

Trychon alleges that he made it his mission to eliminate the causes of the MBTA's $180 million debt.  For example, Trychon brought in consultants to review the MBTA's station cleaning program, working with them on creating new, more cost-effective contract specifications.  As a result of his efforts, Trychon asserts that he saved taxpayers $18 million over a five-year period.  According to Trychon, with the exception of his direct superior, Michael Turcotte,[3] MBTA management was not interested in changing the "culture of waste and inefficiency."

Contract fraud investigation.  Assigned by Turcotte on or about February 10, 2011, to investigate possible contract fraud, Trychon alleges he uncovered two improprieties at the MBTA:  the illegal extensions of expired contracts and the practice of dividing large contracts and purchases into smaller ones to avoid the necessity of management approval.  Trychon reported his findings to Turcotte and to Jonathan Davis, the then acting general manager of the MBTA (GM) and former head of the procurement department.  An official fraud investigation revealed that the root cause of the fraud was the procurement department.  As a result of the investigation, at least one

---

[3] Turcotte, who held the position of director of SMI when Trychon was hired, was subsequently promoted to the position of assistant general manager of the MBTA.

employee was fired.  Informed by the investigating accountant that the evidence of fraud in the procurement department "ran very deep" and that many more employees would be implicated if the investigation continued, Davis stopped the investigation.

Eyewear policy.  In or about May, 2011, Trychon noticed a significant number of eye injuries sustained by MBTA employees. As a result of an investigation, Trychon drafted and implemented a new eyewear policy that required all E & M employees performing potentially hazardous duties to wear protective equipment.  After Trychon and Turcotte discovered general disregard of that policy by E & M employees during a department-wide safety audit, a directive was issued requiring all E & M managers to conduct daily safety inspections and to file daily reports.

On or about January 25, 2012, an employee who reported to Patrick Kineavy, the director of MOW, was disciplined for refusing to put on the required eyewear as instructed by Trychon.  When Trychon observed continuing noncompliance with the policy among Kineavy's group, Kineavy received a written warning, was placed on a thirty-day corrective action plan, and was required to document and report his safety-compliance inspections.  When asked to produce proof of his safety-compliance inspections, Kineavy was unable to do so, and later

provided Trychon with twelve allegedly fabricated safety observations.

In or about April, 2012, Trychon wrote a memorandum to Turcotte recommending that Kineavy be removed from his director duties. Acting GM Davis and MBTA human resources director William Perez[4] rejected that recommendation independently submitted to them by Turcotte. Kineavy's safety-compliance reporting duties were switched from Trychon to Turcotte.

In August, 2012, Turcotte sought in writing Kineavy's termination based upon Kineavy's verbal threat,[5] failure to enforce the eyewear policy, fraudulent reporting, and continued poor performance reviews. State Secretary of Transportation Richard Davey and acting GM Davis stepped in and created a new job for Kineavy with minimal responsibilities and better pay. They also switched Kineavy's reporting duties to Sean McCarthy, "an old South Boston buddy of [Kineavy]."[6]

---

[4] The complaint also refers to Perez as the "AGM of H.R." and as the "Mass DOT Director of Human Resources."

[5] During a telephone call in which Kineavy became loud, threatening, and abusive, Kineavy stated to Turcotte, "I am going to fix you once and for all -- and for good." By electronic mail, Turcotte notified senior management, including Davis and Perez, and State Secretary of Transportation Richard Davey of Kineavy's "outrageous behavior and threats," expressing his desire that Kineavy be terminated. No action was taken.

[6] The complaint alleges that Kineavy's brother, Michael Kineavy, enjoyed political influence at the municipal and State level based on his former employment in a high policy-making

Suspected time fraud.  The complaint further alleges that "[i]t was reported" to Trychon and Turcotte that "very close friends" of Kineavy and Matthew McGuire, the deputy director of MOW, did not punch in for work by hand scanner as required by MBTA policy, but were still being paid.  Trychon determined that a supervisor in SMI "was taping or was allowing his name to be taped" on time sheets without properly verifying that the employees had actually reported for work.  Trychon decided to conduct a full investigation of E & M to determine the extent of the practice.  News of the investigation leaked, and the original records of Kineavy and McGuire were stolen.

Unsafe track conditions.  Trychon claims that, pursuant to State regulation, the MBTA is required to "update and create new track standards every two (2) years."[7]  In or about August, 2012, Trychon discovered that the last updates were made in 2008. Trychon directed Kineavy and McGuire to bring the MBTA into regulatory compliance as soon as possible.  To that end, Trychon approved the hiring of a highly-regarded, independent track inspector, HNTB.  The report issued by HNTB warned the MBTA of alarming safety conditions needing correction that dated back to

position with the city of Boston and his role in a successful gubernatorial campaign.

[7] The MBTA correctly points out that the regulations cited in the complaint, "[220] CMR 151.11 (track inspection) and [220] CMR 151.12 (track maintenance)," did not and do not impose that duty.

HNTB's previous inspection in 2006. Neither Kineavy nor McGuire had addressed the unsafe track conditions since 2006. McGuire steered the report to himself and did not disclose it to Trychon.

A concerned member of McGuire's staff provided copies of the HNTB report to Trychon, who in turn passed copies on to Turcotte and to his subordinates, directors Joseph McNall and Andrew Baker.[8] Asked by Turcotte why he had hidden the results of the report, McGuire allegedly became enraged and accused Turcotte and Trychon of "having an agenda" against him and Kineavy. When Turcotte requested that Perez "relieve [McGuire] of his duties," Perez stated that he would transfer McGuire to the MBTA's safety department. McGuire informed his boss, Baker, that "[b]ig changes are coming, and he (McGuire) is not going anywhere." Baker reported the comment to Trychon and to Turcotte.

Adverse employment actions. The complaint also alleges that following Turcotte's "functional[] demot[ion]," on March 1, 2013, by the new GM, Beverly Scott, Turcotte resigned. On April 9, 2013, Trychon received an unsigned card that stated, "'Good luck.' 'Enjoy your layoff!' and 'Fuck off.'" On the following day, Perez informed Trychon that he was laid off. At the time,

_____

[8] As explained by the MBTA, at the time, McNall was the director of the signal department, while Baker was the director of MOW.

Trychon had not yet completed his investigation of the suspected time fraud.

3. <u>Discussion</u>. In general, G. L. c. 149, § 185, protects public employees from retaliation by their employers for disclosing to a supervisor or public body workplace activities, policies, or practices that the employee reasonably believes violate the law, or pose a risk to public health, safety, or the environment.[9] There is little decisional law by our appellate courts construing § 185's provisions. In contrast, the Federal courts have had the opportunity to construe and apply § 185 on a number of occasions. While we are required to make our own judgment about the intent of the Legislature in adopting the

---

[9] General Laws c. 149, § 185(<u>b</u>), inserted by St. 1993, c. 471, states, in relevant part:

"An employer shall not take any retaliatory action against an employee because the employee does any of the following:

"(1) Discloses, or threatens to disclose to a supervisor . . . an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment; [or]

. . . .

"(3) Objects to[] . . . any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment."

statute, and are not bound by interpretations reached by Federal courts, we regard those decisions as persuasive authority and, in this case, find them to be instructive.  See Fidler v. E. M. Parker Co., 394 Mass. 534, 545 (1985).

There are three elements to a whistleblower claim brought under G. L. c. 149, § 185.  The plaintiff-employee must prove that (1) the employee engaged in a protected activity; (2) participation in that activity played a substantial or motivating part in the retaliatory action; and (3) damages resulted.[10]  See Welch v. Ciampa, 542 F.3d 927, 943 (1st Cir. 2008); Taylor v. Freetown, 479 F. Supp. 2d 227, 241 (D. Mass. 2007).  The plausibility standard, as clarified by the United States Court of Appeals for the First Circuit, does not require the pleading of specific facts to establish each element of the prima facie case.[11]  See Rodriguez-Reyes v. Molina-Rodriguez, 711

---

[10] In analyzing § 185 claims, the United States Court of Appeals for the First Circuit applies the causation standard utilized in retaliation and discrimination cases brought under 42 U.S.C. § 1983.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 286-287 (1977); Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301-302, 303 (1st Cir. 2014).  See also Harris v. Trustees of State Colleges, 405 Mass. 515, 522-523 (1989).  Here, the motion judge applied the determinative cause standard.  See Lipchitz v. Raytheon Co., 434 Mass. 493, 504-506 (2001).  Where the issue is not raised, we have no occasion to address the conflict in this appeal.

[11] For a statement of the prima facie case of a claim under a related whistleblower statute specific to the health care industry, G. L. c. 149, § 187(b)(3), see Romero v. UHS of

F.3d 49, 54 (1st Cir. 2013) (noting that "prima facie [case] is an evidentiary standard, not a pleading standard").  The prima facie elements, however, are relevant "background against which a plausibility determination should be made."  Ibid.

a.  Protected activity.  Only certain acts are protected by § 185, including, as relevant in this case, disclosures (or threatened disclosures) to a supervisor of and objections to an employer's activity, policy, or practice that the employee reasonably believes violates the law or poses a risk for public health or safety.  See G. L. c. 149, § 185(b)(1), (3).  We construe the allegations of the complaint as resting on both statutory subsections.

Trychon has alleged sufficient facts to plausibly show that he engaged in one or more activities protected by § 185.  First, following his investigation into alleged contract fraud, he reported two practices (the extension of expired contracts and the splitting of contracts) that he reasonably could have believed violated the public bidding law.[12]  See G. L. c. 149,

_____

Westwood Pembroke, Inc., 72 Mass. App. Ct. 539, 540-541 & n.4 (2008).

[12] Even assuming without deciding that the particularity requirement for "averments of fraud," Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974), applies in the context of a statutory whistleblower claim, the complaint contains sufficient allegations to avoid a motion to dismiss.  See Friedman v. Jablonski, 371 Mass. 482, 488-489 (1976).  The complaint provided the MBTA with the date of Trychon's discovery of

§ 44J(1), (3).  Compare <u>Romero</u> v. <u>UHS of Westwood Pembroke, Inc</u>., 72 Mass. App. Ct. 539, 541 & n.3 (2008).

Second, even if he was mistaken about the track inspection and maintenance laws, Trychon reasonably could have believed, based on HNTB's 2012 report and on common sense, that the MBTA's failure to correct the alarming track conditions for six years posed a risk to the public safety within the meaning of § 185. His disclosures to Turcotte of the updated HNTB report, the nonfeasance by Kineavy and McGuire, and the alleged cover-up by McGuire qualified as protected activity for purposes of pleading his § 185 claim.

We agree with the MBTA that the phrase "a risk to public health, safety or the environment," as it appears in § 185, means a risk to public health, <u>public</u> safety, or the environment.  However, drawing on our judicial experience and common sense, we are not persuaded by the MBTA's further argument that Trychon's disclosures to his supervisors about the high incidence of eye injuries among employees, and the failure of certain managers to enforce the MBTA's policy designed to

---

contract improprieties, the two types of fraudulent practices involved, and the actions flowing from the investigation (termination of employee, commencement of formal investigation, and cover-up of more fraud by acting GM Davis).  Combined, those allegations gave the MBTA enough notice of the claim to allow it to prepare a defense.  More detailed factual allegations were not required at that early stage of the litigation.  See <u>Bell Atl. Corp.</u>, 550 U.S. at 555-556; <u>Ashcroft</u>, 556 U.S. at 678.

reduce the number of such injuries is not, as a matter of law, a disclosure relating to the public health or public safety.[13] Disclosures relating to workplace activities, policies, or practices that have a significant impact upon the cost of public employment, including healthcare costs, may diminish the availability of limited public funds for other pressing public needs, including public needs relating to health and safety, and therefore may be protected under the whistleblower statute. The MBTA is dependent upon public funding from the Commonwealth and its cities and towns to sustain its operations. See, e.g., St. 2015, c. 46, § 2E (line items 1595-6368 and 1595-6369 of the general appropriations law for fiscal year 2016, transferring public funds to accounts earmarked to support the operation of

---

[13] The decision in Oulton vs. Brigham & Women's Hosp., Inc., U.S. Dist. Ct., No. 12-10440-GAO, at 3-4 (D. Mass. March 29, 2013), is not to the contrary. There, the court dismissed an employee's whistleblower claim under G. L. c. 149, § 187(b), on grounds that the statute in question was designed to safeguard hospital employees who make disclosures relating to patient care but not disclosures relating to the health of hospital employees. Also, our decision in Service v. Newburyport Hous. Authy., 63 Mass. App. Ct. 278 (2005), where an employee's disclosure concerning abusive language in the workplace that was contrary to a personnel policy was deemed outside the protection of § 185, is distinguishable. Id. at 279, 283-284. In view of what has been said, it is unnecessary for us to consider whether the phrase "public health, safety, or the environment," as appearing in § 185, represents an even broader legislative intent to safeguard disclosures that affect the health and safety of workers in the private sector where the resulting expenditure of public funds may be more attenuated, or not involved at all.

the MBTA).[14]  One operational cost of the MBTA is the payment of benefits to employees injured on the job because the MBTA is a self-insurer.  See McCarthy's Case, 66 Mass. App. Ct. 541, 541, 545-546 (2006).  To the extent that the MBTA uses taxpayer dollars to compensate its injured employees, it diminishes the availability of those funds to be used for other purposes relating to public health and public safety.  At this early stage of the proceedings, we cannot say, as a matter of law, that Trychon has not stated a plausible claim for relief with regard to the MBTA's eye injury policy.

On the other hand, the allegations relating to the suspected time fraud were too vague to support an inference that Trychon qualified for protected whistleblower status.  An unnamed third party reported the violation of the hand scanner policy to Trychon and to Turcotte.  Trychon, it was alleged, took two actions:  he determined that a particular supervisor in SMI was not verifying employee time and he commenced an "E&M-wide" investigation.

While a reasonable inference of fraudulent time reporting involving Kineavy and McGuire could be drawn, these sparse facts

---

[14] See also G. L. c. 161A, § 8, added by St. 1999, c. 127, § 51 (financial contribution to MBTA by Commonwealth); G. L. c. 161A, § 9, as amended by St. 2008, c. 182, § 62 (financial contribution to MBA from cities and towns).  A review of the Commonwealth's annual and supplemental appropriation laws indicates regular transfers of public funds to support the operation of the MBTA.

do not support an inference that before his layoff, Trychon engaged in any protected activity as to the suspected time fraud.  No disclosure of, or threat to disclose, suspected time fraud to a supervisor may reasonably be inferred from these facts.  See Estock v. Westfield, 806 F. Supp. 2d 294, 309 (D. Mass. 2011) ("The [whistleblower] statute prohibits retaliatory conduct on the part of an employer, not preventative conduct").

Although Trychon's allegations concerning his conduct with respect to the suspected time fraud do not amount to protected activity, his other allegations of whistleblowing at this stage of the litigation are sufficient to withstand dismissal for failure to state a claim.

b.  Causation.  We conclude that Trychon's complaint, viewed as a whole, sufficiently alleged a causal connection between the protected activities and a retaliatory layoff to satisfy the plausibility standard.[15]

At the time of his discharge, Trychon's trajectory was on the rise.  He had evidently proven himself to be an effective and dedicated public employee, saving taxpayers millions of dollars, identifying fraudulent contracts, and exposing alarming track conditions that posed a risk to public safety.  He had

---

[15] Trychon alleged that "[he] was laid off because of his actions, protected by the [whistleblower statute], to wit, he uncovered and reported fraud, reported safety violations to his supervisors and opposed corruption and political favoritism."

been promoted twice, and the scope of his job responsibilities was expanding.  Generally, unless adverse conditions require a different course of action, employers who follow sound business practice do not select employees with excellent performance records for termination.  Likewise, employers who follow sound business practice do not ordinarily transfer, shield, or reward employees whose poor performance or wrongful acts warrant termination, as the MBTA allegedly did according to the complaint.

Trychon alleged adequate facts plausibly suggesting retaliatory animus harbored by MBTA management.  The narrative of the complaint suggests a continuing pattern of opposition and hostility to Trychon, and to his mainstay Turcotte, over an extended period of time.  Trychon claims that Kineavy and McGuire disregarded his directives, left fraudulent reports in his mailbox, hid HNTB's alarming inspection report, and stole original records to thwart his time fraud investigation. Kineavy allegedly threatened to "fix" Turcotte "for good," while McGuire accused Trychon and Turcotte of having a personal agenda against him and Kineavy.

The retaliatory animus supposedly extended to the upper echelons of management.  One could reasonably infer that acting GM Davis did not appreciate Trychon's embarrassing disclosure of wrongdoing in a department that he personally had overseen, and

that he wanted Trychon and his spotlight gone. After having shelved the investigation to avoid the implication of more employees in the contract fraud, Davis evidently supported the insubordinate and hostile Kineavy over Trychon and Turcotte. Indeed, it could be inferred that Davis, supported by Secretary Davey, rewarded Kineavy with an objectively better job for his opposition. The complaint alleges that the consequence of McGuire's six years of nonfeasance as to track safety and his nondisclosure of the disturbing HNTB report was a planned transfer to the safety department.[16] The treatment afforded to Kineavy and to McGuire plausibly suggested that they had influence far higher than their subordinate positions in the organizational chart.[17]

In short, for pleading purposes, the hostile acts and statements by Kineavy and McGuire, the unnatural protection afforded those individuals, and acting GM Davis's suppression of the official contract fraud investigation initiated because of Trychon permit a plausible inference that Trychon's protected activities played a substantial or motivating part in the decision to terminate him. Given the continuing pattern of

---

[16] While McGuire's prediction about the imminent arrival of "[b]ig changes" proved accurate, it is unclear whether he was able to stop his own transfer.

[17] We agree with the MBTA and the judge that the animus displayed by the author of the anonymous note could not reasonably be attributed to an MBTA decision-maker.

opposition faced by Trychon, the temporal gap between Trychon's protected conduct and his termination was not so attenuated as to fail to meet the plausibility standard.

Trychon did not identify the individual who made the final decision to discharge him. Where, as here, it could reasonably be inferred that Davis and managers under his protection influenced that decision, the omission did not warrant the dismissal of the complaint.[18] See Mole v. University of Mass., 442 Mass. 582, 598-600 (2004).

In the alternative, the MBTA urges us to affirm the judgment based on the "normal job duties" exclusion. That doctrine limits employer liability where the employee's disclosure to a supervisor occurred as part of the employee's required job duties. We decline the MBTA's invitation to reach this novel issue of law, which was raised for the first time on

---

[18] The timeline plausibly suggested the involvement of adverse management in the layoff decision. It could reasonably be inferred that in making employment decisions, Scott, the new GM who replaced Davis, relied on the input of her predecessor. Approximately one month after Scott functionally demoted Turcotte, the only other manager that supported culture change, Trychon himself was terminated. At the time, Trychon was in the middle of a promising time fraud investigation involving Kineavy and McGuire. Those facts, taken as true for purposes of the complaint, were sufficient to send the case to the discovery phase. See Lopez, 463 Mass. at 711-712.

appeal.[19]  See <u>Moronta</u> v. <u>Nationstar Mort., LLC</u>, 88 Mass. App. Ct. 621, 626 n.12 (2015).

4.  <u>Conclusion</u>.  For the above reasons, the allegations set forth in Trychon's complaint, along with the reasonable inferences that may be drawn from them in Trychon's favor, which at this stage we must assume to be true, were sufficient to withstand the defendant's motion to dismiss.  Accordingly, the judgment dismissing the complaint is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.

---

[19] The First Circuit recently stated that there is not a general job duties exception to statutory whistleblower protection under Maine's Whistleblower Act.  See <u>Harrison</u> v. <u>Granite Bay Care, Inc</u>., 811 F.3d 36, 47-52 (1st Cir. 2016) (public employee's conduct is protected even if disclosure is within her job duties so long as she is motivated by intent to bring wrongdoing to light).